IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 22, 2013 Session

## ALEXANDER A. ROGIN v. JOELLE L. ROGIN

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-002081-11    Robert S. Weiss, Judge**

_____

**No. W2012-01983-COA-R3-CV - Filed July 10, 2013**

_____

This appeal involves various financial issues related to a divorce. The trial court: (1) calculated both parents' incomes for purposes of child support; (2) required Father to pay a portion of the children's private school tuition; (3) entered a permanent parenting plan giving Mother final authority over major decisions regarding the children; (4) divided the marital property; (5) denied Father's request for transitional alimony; (6) awarded Father alimony *in solido*; and (7) denied both parties' requests for attorneys fees. We: (1) reverse the trial court's determination that Father is willfully and voluntarily underemployed; (2) vacate the trial court's calculation of Mother's income; (3) vacate the trial court's ruling requiring Father to pay a portion of the children's private school tuition; and (4) remand for appropriate findings of fact and conclusions of law. We affirm as to the remainder of the issues presented. Vacated in part, reversed in part, affirmed in part, and remanded for further proceedings.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Vacated in Part; Reversed in Part; Affirmed in Part and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J.,W.S., and DAVID R. FARMER, J., joined.

Kay Farese Turner and Madeline L. Nolan, Memphis, Tennessee, for the appellant, Alexander A. Rogin.

Mitchell D. Moskovitz and Adam N. Cohen, Memphis, Tennessee, for the appellee, Joelle L. Rogin.

**OPINION**

# I. Background

Appellant Alexander Rogin ("Father") and Appellee Joelle Rogin ("Mother") were married in 2003. Both parties earned Masters of Business Administration degrees ("MBAs") from Vanderbilt University. The parties have two minor children, who attended private school throughout the marriage. The parties separated, but maintained the same residence, in November 2010. Father filed for divorce on May 2, 2011. Mother answered and filed a counter-claim for divorce on June 10, 2011. Trial was scheduled, but was continued because, approximately six weeks from the original trial date, Mother listed six potential expert witnesses in her interrogatories. On February 9, 2012, the parties entered into a consent order establishing a temporary parenting plan. The temporary parenting plan: (1) provided that Mother would pay Father $62,500.00 as a premature distribution of marital property; (2) set out a parenting schedule for the children; and (3) provided that the parties would have joint decision making authority with regard to the children, with all disputes being referred to a neutral decision-maker. In addition, the consent order provided that Father was to vacate the marital home and that Mother would pay him alimony *pendente lite* in the amount of $1,500.00 per month from January 2012 until the time of trial.

The trial was eventually held on April 30, 2012 through May 3, 2012. At trial, Father testified that he had lost his job in October 2008 at Kemmons Wilson due to cut backs in his department—real estate—and the general down-turn in the economy at that time. He testified that he had been networking in order to gain new employment, but that he had not, to date, been successful in procuring full-time employment. During his testimony, Father produced a list of the people he had networked with over the intervening years including Mother's father and Mother's financial advisors, but could not say which of those people he had actually sent resumes to. Father testified that he had not employed a head hunter. However, Father did testify that his networking had led to a number of part-time consulting jobs, which he had taken in order to further network. In addition, Father testified that he believed his skills were best suited to a start-up partnership venture rather than traditional employment, but clarified that he would not have turned down traditional employment had he ever received such an offer. Father testified that the loss of his job caused the demise of the marriage because Mother was critical of his lack of success. Father further testified that at the time of trial, he was working as an independent consultant, making approximately $1,487.00 per month. Father testified that since the separation, including when Father still lived in the marital residence, he used none of his income to fund household expenses or to pay child support.

Mother took issue with Husband's decision to try to pursue employment with various start-up companies that subsequently folded, instead of seeking traditional employment. Mother employed an occupational expert that opined that Husband's earning capacity was

somewhere between $75,000.00 and 125,000.00 given his experience and education. Mother testified that Father was offered a job out of state in 2011, paying between $150,000.00 and $200,000.00. Father testified that he declined that offer because it would have meant moving the family away from their home and Mother losing her job. In contrast, Mother testified that the parties delayed moving until Father could gain the required license for the position, but that Father never endeavored to obtain the license.

Father also testified that he had gone into significant debt during the pendency of the divorce in order to support himself, as Mother froze the home equity line of credit and his credit card. Mother, however, took issue with this testimony, noting that Father had taken several trips to see concerts during the separation and the pendency of the divorce. Further, Father admitted that he had purchased a $200,000.00 home during the pendency of the divorce and had undertaken approximately $125,000.00 in renovations, despite Father's testimony that the home was in "livable" condition when it was purchased. In addition, Mother testified that Father was able to fund his continued recreational use of marijuana. Indeed, Father admitted that during the marriage and the separation, he sometimes smoked marijuana outside the parties' home while the children were inside.

With regard to the children, Father testified that Mother made all of the child care decisions unilaterally, or after consultation with her family or friends. Father further testified that he informed Mother that he wanted the children to attend the public school in Mother's school district, but that Mother had not taken any action to enroll the children there. Father also testified that Mother's parents paid for the children's tuition throughout the marriage, but had only stopped at Mother's request due to the divorce. Mother testified, in contrast, that the parties agreed to send both children to private school. Indeed, she pointed to Husband's own Complaint for Divorce in which he stated that the parties' children would continue to attend St. Mary's. Mother was also only able to provide a range of amounts for the annual tuition at St. Mary's. However, her affidavit of income and expenses listed a monthly figure of $2,192.00, as the combined tuition for both children. Mother further testified that although Father was a "hands-on" parent prior to the separation, once he lost his job, he was no longer the interested parent that he once had been. Indeed, testimony from the children's nanny and baby-sitter corroborated Mother's testimony; both the nanny and babysitter testified that they dealt almost exclusively with Mother after Father lost his job and that Father had become "distant" and disinterested. The record contains several emails between Mother and Father, in which Mother requested that Father take the children on their school holidays. The emails show that Father was generally unwilling to care for the children during these holidays, citing either work commitments or out-of-town trips. Neither Mother, the nanny, nor the babysitter denied that Father and the children loved one another.

With regard to her income, Mother testified that, at the time of trial, she earned

-3-

$142,5000.00 as a base salary from Metropolitan Bank, where she serves as a Vice President. In addition to her base salary, Mother also receives annual bonuses based on performance. Although the bonuses were not necessarily guaranteed, Mother earned $62,000.00 in bonus income in 2011 and $25,000.00 in bonus income in 2012. Mother was unsure as to whether she had received a bonus in 2010. Mother also testified that Metropolitan Bank pays a portion of her membership fee to the University Club, at a value of approximately $300.00 per month. Additionally, Mother receives vested stock options from Metropolitan Bank; documents in the record indicate that Metropolitan disbursed vested stock options to Mother valued at $11,600.00 in 2011 and $7,200.00 in 2012. In addition, Mother testified that her parents gave her a car during the pendency of the divorce. According to Husband, the car's value, as evidenced by the Kelly Blue Book, was approximately $21,400.00 at the time of trial.

Mother and her financial experts testified regarding Mother's trust, interest, capital gain, and partnership income. At the time of trial, Mother had a sole interest in the Joelle Lewis Rogin Grantor Trust ("Grantor Trust"), and a limited interest in the Myron Lewis Family Legacy Trust ("Family Trust"). In addition, Mother owned a portion of the Family Limited Partnership. According to both parties, Mother never received any disbursements from either the trusts or her family limited partnership other than to pay fees and taxes; however, Father contended that because Mother was able to request that disbursements be made to her, such income should be included in Mother's gross income for purposes of child support. Indeed, Mother's Grantor Trust specifically stated that, if Mother requested in writing "that all current net income be distributed to [her], . . . the Trustee shall distribute such income." In contrast, Mother's rights under the Family Trust were more limited, allowing Mother to withdraw contributions to the trust only for a limited period of time after the contribution was made. Mother's father testified that he had contributed $20,000.00 to the Family Trust for Mother in 2011. It was undisputed, however, that Mother did not make any request to receive disbursements from the Family Trust. In addition, Father argued that all of Mother's interest, capital gains, dividend, and partnership income should be included in the calculation of Mother's gross income.

The trial court orally ruled at the conclusion of trial. The trial court ordered that the temporary parenting plan would become permanent, but adopted Mother's proposed parenting plan that allowed Mother to be the final decision-maker for the children. For child support purposes, the trial court calculated Mother's income to be $16,954.00 per month. Father takes issue with this calculation on appeal and argues that it does not include capital gains income, income from her grantor trust, or Mother's partnership income, even though she chose to reinvest much of this income rather than receiving the income quarterly. In addition, Father argues the trial court failed to take into account annual gift income from Mother's parents.

The trial court found Father to be willfully and voluntarily underemployed. Although the trial court stated that it could not impute income to Father at the lowest level allowed by the Child Support Guidelines, the trial court only imputed income to Father of $3,000.00 per month. The trial court also required Father to pay his income share (15%) of the children's private school expenses. The trial court further divided the marital property, awarding each party one-half of the equity in the marital residence and ordering Mother to pay the balance on the home equity line of credit. The trial court further found that all of Mother's investment accounts (not including some stock options) were Mother's separate property. Mother's separate property totaled $2,356,909.00. Father's separate property totaled $68,396.87. Father was denied periodic alimony, but Mother was ordered to repay approximately $27,000.00 as alimony *in solido*, which amount Father testified he removed from the children's college accounts to pay his living expenses during the divorce. Each party was ordered to pay his or her own attorney fees. A final order was eventually entered on August 3, 2012, which incorporated the trial court's oral rulings by reference.

## II. Issues Presented

Father raises the following issues for review, as restated from his brief:

1.      Whether the trial court erred when it calculated Mother's gross income for purposes of child support without including income from all sources, whether earned or unearned?
2.      Whether the trial court erred when it found that Father was willfully underemployed?
3.      Whether the trial court erred when it arbitrarily imputed income to Father of $3,000.00 per month contrary to proof that his income was $1,487.40?
4.      Whether the trial court erred in ordering Father to pay a portion of the children's private school tuition, in addition to the presumptive child support. Further whether the trial court erred when it failed to include the private school tuition payment as an upward deviation on the Child Support Worksheet and contrary to the proof that Mother's parents had historically paid the tuition?
5.      Whether the trial court erred by adopting Mother's proposed permanent parenting plan granting Mother final decision making authority?
6.      Whether the trial court erred when it failed to award Father transitional alimony?
7.      Whether the trial court erred in ordering Father to pay his own attorney fees?

In the posture of Appellee, Mother raises the following issues, as restated from her brief:

1.      Whether the trial court erred in imputing income of only $36,000.00 to Father?
2.      Whether the trial court erred in ordering Mother to reimburse monies that Father unilaterally withdrew from the children's education accounts without Mother's

knowledge or consent?

3.     Whether the trial court erred by requiring Mother to pay off the home equity line of credit?

4.     Whether the trial court erred in not requiring Father to pay a portion, if not all, of Mother's attorney fees?

5.     Should Mother be awarded reasonable attorney fees incurred in defense of Husband's appeal?[1]

## III. Analysis

### A. Child Support

The initial issues in this case concern child support for the parties' two minor children. Father first argues that the trial court erred in setting child support due to: (1) the trial court's failure to consider all of Mother's income; (2) the trial court's error in finding that Father was willfully and voluntarily underemployed, allowing the trial court to impute income to Father

---

[1] As a point of practice, we note that Tennessee Rule of Appellate Procedure 24(a) provides, in relevant part, that:

> The following papers filed in the trial court **are excluded** from the record: (1) subpoenas or summonses for any witness or for any defendant when there is an appearance for such defendant; (2) **all papers relating to discovery, including depositions, interrogatories and answers thereto, reports of physical or mental examinations, requests to admit, and all notices, motions or orders relating thereto;** (3) any list from which jurors are selected; and (4) trial briefs; and (5) minutes of opening and closing of court. Any paper relating to discovery and offered in evidence for any purpose shall be clearly identified and treated as an exhibit. No paper need be included in the record more than once.

*Id*. (emphasis added).

This record contains several volumes, in large part due to the inclusion of various interrogatories, other discovery materials, and the depositions of all witnesses, in addition to transcripts of their trial testimony. It is too often the case that an Appellant includes all filings made in the trial court and every portion of the transcript of the hearing (including arguments of counsel) in contravention of the foregoing Rule of Appellate Procedure. The problem with inclusion of extraneous filings that are clearly excluded from the appellate record is that it places upon this Court a duty that falls to the Appellant—to prepare a correct and complete record on appeal. Tenn. R. App. P. 24(b). In making that record, the Appellant should adhere to the mandates contained in Tennessee Rule of Appellant Procedure 24(a). This Court endeavors to file its opinions in a timely manner; however, when placed in the position of having to review volumes of extraneous, unnecessary, and irrelevant filings, our goal is hindered and the interests of judicial economy are stymied.

in the amount of $36,000.00 per year; and (3) the trial court's error in awarding Mother private school tuition expenses without first making a written finding of fact that such an upward deviation from the child support guidelines was appropriate and in the children's best interest. Mother contends that the trial court correctly determined her income, but argues that the trial court erred in failing to impute more income to Father for child support purposes. Mother also argues that the trial court correctly required Father to pay a portion of the children's private school tuition.

The initial determination of a child support order is governed by Tennessee Code Annotated Section 36-5-101. Tennessee Code Annotated Section 36-5-101(e)(1)(A) instructs the trial court to apply the child support guidelines, as set forth in the rules and regulations of the Department of Human Services, as a rebuttable presumption in determining the amount of child support. *See* Tenn. Comp. R. & Regs. § 1240-2-4-.01. Even with the adoption of the child support guidelines, trial courts retain a certain amount of discretion in their decisions regarding child support, which decisions we review under an abuse of discretion standard. *Richardson v. Spano*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). A trial court abuses its discretion when it has applied an incorrect legal standard or has reached a decision which is against logic or reasoning that caused an injustice to the party complaining. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). We likewise review a trial court's decision with respect to whether a deviation from the child support guidelines is warranted under the abuse of discretion standard. *In re Chase B.S.*, No. W2011-02334-COA-R3-JV, 2012 WL 5990226, at *8 (Tenn. Ct. App. Nov. 30, 2012). The trial court's discretionary decision to deviate from the child support guidelines must nevertheless "take into consideration the applicable law and the relevant facts." *Id.* (citing *Reeder v. Reeder*, 375 S.W.3d 268, 275 (Tenn. Ct. App. 2012)).

"The fairness of a child support award depends on an accurate determination of both parents' gross income or ability to support." *Massey v. Casals*, 315 S.W.3d 788, 795 (Tenn. Ct. App. 2009). In most cases, a parent's earning capacity or ability to earn income is equivalent to the parent's gross income. *Id.* Accordingly, the trial court was first tasked with determining both Mother's and Father's gross income in order to calculate child support.

### 1. Mother's Income

We first turn to Father's contention that the trial court failed to consider all of Mother's income, earned or unearned, in calculating the parties' child support obligation. Income for purposes of the calculation of child support is defined as:

> [I]ncluding, but not necessarily limited to: wages, salaries, commissions, bonuses, workers' compensation, disability,

payments pursuant to a pension or retirement program, profit sharing, interest, annuities, and other income due or to become due to the obligor.

Tenn. Code. Ann. § 36-5-501(a)(1). Tennessee Compiled Rules and Regulations elaborates on what types of income may be considered for purposes of the Child Support Guidelines, including "[i]nterest income," "[d]ividend income," "[t]rust income," "[n]et capital gains," and "[g]ifts that consist of cash or other liquid instruments, or which can be converted to cash." Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a).

In this case, Mother filed a Rule 14C Affidavit of Income and Expenses in which she averred that her income was $11,875.00 per month, totaling $142,500.00 per year. Mother noted, but did not include in her income, that she had received bonuses in previous years, including a $25,000.00 bonus in 2012 for work performed in 2011. Father, in contrast, argued in his Proposed Permanent Parenting Plan that Mother's true income for child support purposes should be $21,205.59, based on her bonuses, investment income, and gifts. The trial court found that Mother's income was actually $16,954.00 per month. Specifically, the trial court stated in its oral ruling:

> With regard to child support, a lot of numbers were thrown out as what potential income for Mother and for Father was, and I have kind of tried to walk through how I calculated Mother's income.
> . . . . I have Mother's Metropolitan [Bank] income from 2011, I used that actual figure. I did not have her investment income from sources, so I averaged the years 2009, 2010 . . . , which came out to an average of $24,601[.00].
> I added that to her 2011 W-2 income from Metropolitan. I then averaged that total with her total income for 2010. As a result I came—so the average of those two years, recapturing a number for the investment income, comes out to $203,451[.00], which works out to $16,954[.00].

Thus, the trial court concluded that Mother's total income for purposes of child support, including consideration of all her variable trust and investment income, as well as her salary and bonus from Metropolitan Bank, totaled $203,451.00.

Father first argues that the trial court failed to consider the $20,000.00 that Mother's father contributed to the Family Trust, which was available to Mother. In addition, Father argues that the trial court miscalculated Mother's investment income. Father argues that

Mother's variable income, including interest, capital gains, dividend, and partnership income for 2009 was $49,037.00 and was $36,727.00 for 2010. Averaging these two years, Father argues that Mother's variable income for purposes of child support, not including her salary or bonuses from Metropolitan Bank, should be $42,882.00, a much larger figure than the trial court's $24,601.00. Mother argues, however, that Father's calculation is incorrect because it fails to take into account Mother's capital losses. *See Moore v. Moore*, 254 S.W.3d 357, 360 n.5 (Tenn. 2007) (noting that the Child Support Guidelines were amended in 2007 to ensure that capital losses were considered when calculating parent's income for purposes of child support). In addition, Father argues that benefits Mother receives from her employment with Metropolitan Bank, including vested stock options and payment of University Club memberships fees, should also be included in Mother's gross income. In contrast, Mother argues that all of the stock options were divided as marital property and should not be considered or were correctly considered in the calculation of Mother's income based on their inclusion in her 2011 tax return, which the trial court utilized in calculating Mother's income. *See* Tenn. Code Ann. § 36-4-121(b)(1)(E) ("[A]ssets distributed as marital property will not be considered as income for child support or alimony purposes, except to the extent the asset will create additional income after the division."). Father also argues that the trial court failed to consider a gift of a car to Mother, which vehicle was allegedly valued at over $20,000.00, arguing that the car constitutes a "[g]ift[] that . . . can be converted to cash." Tenn. Comp. R. & Regs. § 1240-2-4-.04(3)(a)(xviii). Furthermore, Father argues that it is unclear as to whether the trial court considered Mother's bonus income in calculating her gross income for purposes of child support. The record shows that Mother earned approximately $62,500.00 as bonus income in 2011 and $25,000.00 in bonus income in 2012.

We agree that it is unclear whether the trial court properly considered the totality of the evidence with regard to Mother's income. First, the trial court utilized Mother's 2011 base income from Metropolitan Bank, where Mother earned approximately $135,416.68. However, it was undisputed at trial that Mother received a raise and was presently earning $142,500.00 as base salary from Metropolitan Bank. Further, it appears that in calculating Mother's income for 2011 based on her income tax returns, the trial court considered only Mother's gross taxable income, rather than her gross income. "It is clear from the Guidelines that . . . nontaxable pay and allowances are to be included in figuring gross income." *Wade v. Wade*, 115 S.W.3d 917, 922 (Tenn. Ct. App. 2002). From our review of Mother's 2011 tax documents, her gross income included $135,416.68 as base income, $56,875.00 in discretionary income (i.e. bonuses), and $11,600 in vested stock options, which totals $203,891.68. This $203,891.69 calculation does not include any consideration of Mother's trust or investment income. Thus, our calculation of Mother's income solely from Metropolitan Bank constitutes more than the trial court's total calculation of Mother's total income, including variable investment and trust income earned from her separate assets.

Finally, it is difficult to discern the basis for the trial court's ruling regarding Mother's variable income, including gifts, stock options, bonuses, trust income, and investment income, given the sparse findings made by the trial court on this issue. As set out above, the trial court's order is meager on findings concerning the basis for the trial court's calculation of Mother's income. The order does not elaborate on how the trial court calculated any of Mother's investment income. *Palmer v. Palmer*, 562 S.W.2d 833, 837 (Tenn. Ct. App. 1977). Rule 52.01 of the Tennessee Rules of Civil Procedure provides, in pertinent part:

> In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein.

*Id*. Prior to July 1, 2009, trial courts were only required to make specific findings of fact and conclusions of law "upon request made by any party prior to the entry of judgment." *See Poole v. Union Planters Bank N.A.*, No. W2009-01507-COA-R3-CV, 337 S.W.3d 771, 791 (Tenn. Ct. App. 2010) (noting the amendment). However, the current version of Rule 52.01 requires the court to make these findings regardless of a request by either party. *Id.*

This Court has previously held that the General Assembly's decision to require findings of fact and conclusions of law is "not a mere technicality." *In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *8 (Tenn. Ct. App. May 15, 2009). Instead, the requirement serves the important purpose of "facilitat[ing] appellate review and promot[ing] the just and speedy resolution of appeals." *Id*.; *White v. Moody*, 171 S.W.3d 187, 191 (Tenn. Ct. App. 2004); *Bruce v. Bruce*, 801 S.W.2d 102, 104 (Tenn. Ct .App. 1990). "Without such findings and conclusions, this court is left to wonder on what basis the court reached its ultimate decision." *In re K.H.*, 2009 WL 1362314, at *8 (quoting *In re M.E.W*., No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *19 (Tenn. Ct. App. April 21, 2004)). The Tennessee Supreme Court has held that in order to determine whether a trial court abused its discretion, the appellate court must " look to th[e] evidence *and* the trial court's findings of fact and conclusions of law to determine whether the trial court's ruling was an abuse of discretion." *Spicer v. State*, 12 S.W.3d 438, 445 (Tenn. 2000) (emphasis added). Without sufficient findings of fact and conclusions of law, the appellate court is unable to adequately review the trial court's decision.

Generally, the appropriate remedy when a trial court fails to make appropriate findings of fact and conclusions of law pursuant to Rule 52.01 is to "vacate the trial court's judgment

and remand the cause to the trial court for written findings of fact and conclusions of law." ***Lake v. Haynes***, No. W2010-00294-COA-R3-CV, 2011 WL 2361563, at *1 (Tenn. Ct. App. June 9, 2011). However, this Court has previously held that when faced with a trial court's failure to make specific findings, the appellate courts may "soldier on" when the case involves only a clear legal issue, ***Burse v. Hicks***, No. W2007-02848-COA-R3-CV, 2008 WL 4414718, at *2 (Tenn. Ct. App. Sept. 30, 2008), or when the court's decision is "readily ascertainable." ***Burgess v. Kone, Inc.***, No. M2007-0259-COA-R3-CV, 2008 WL 2796409, at *2 (Tenn. Ct. App. July 18, 2008). In this case, the issues concerning Mother's income for purposes of child support involve neither a clear legal issue, nor is the basis for the trial court's calculation "readily ascertainable." ***Id.*** Accordingly, we vacate the trial court's ruling with regard to Mother's income for purposes of child support and remand to the trial court for entry of an order outlining the basis for the trial court's calculation of Mother's income.

### 2. Father's Income

Father next argues that the trial court erred in finding that he was willfully and voluntarily underemployed and in imputing income to him of $36,000.00 per year. In contrast, Mother argues that the trial court correctly determined that Father was willfully and voluntarily underemployed, but that the trial court erred in failing to impute more income to Father, consistent with his education and earning capacity.

It was undisputed that Father's actual income at the time of trial was approximately $1,487.00 per month. Prior to being laid-off from Kemmons Wilson, Father earned a maximum of $95,000.00 per year. However, Father asserts that his failure to maintain full-time employment consistent with his previous earnings is not the product of a willful failure to seek employment, but rather is the result of poor market conditions in his particular field— real estate. Mother, on the other hand, employed an expert, who opined that given Father's education and experience, he should be making between $75,000.00 to $125,000.00 in the Memphis market. In addition, the expert, having read Father's deposition testimony regarding his job search, testified that Father had not made a good faith effort to find suitable employment, but had instead focused on start-up companies. Father admitted that his recent focus on start-up companies had yet to secure him full time employment, but added that these start-up companies were simply a means of networking. In addition, Mother pointed to Father's choice to decline his own father's job offer in Connecticut, which would have paid upwards of $150,000.00.

Under the Child Support Guidelines, the trial court may impute income under certain limited circumstances. *See* ***Goodman v. Goodman***, No. W2011-01971-COA-R3-CV, 2012 WL 1605164, at *4 (Tenn. Ct. App. May 7, 2012); *see also* Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(i)(I–III). The ***Goodman*** Court explained:

[T]he Guidelines provide that: "[i]mputing additional gross income to a parent is appropriate . . . [i]f a parent has been determined by a tribunal to be willfully and/or voluntarily underemployed or unemployed." Tenn. Comp. R. & Regs. 1240–2–4–.04(3)(a)(2)(i). However, to trigger this portion of the child support guidelines and "[t]o calculate a child support award based on earning capacity rather than actual net income, there must be a threshold finding that the obligor parent is willfully and voluntarily underemployed or unemployed." *Marcus v. Marcus*, No. 02A01-9611-CV-00286, 1998 WL 29645, at *3 (Tenn. Ct. App. Jan. 28, 1998) (emphasis added); *see also* **Kendle v. Kendle**, No. M2010-00757-COA-R3-CV, 2011 WL 1642503, at *3 (Tenn. Ct. App. April 28, 2011) (citing Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(i)(I)).

*Goodman*, 2012 WL 1605164, at *4. In *Goodman*, the trial court failed to make the requisite finding that the obligor father was willfully and voluntarily underemployed. Accordingly, the Court of Appeals reversed the trial court's imputation of income to the father. In this case, however, the trial court made an express finding that Father was willfully and voluntarily underemployed. In explaining its ruling in court, the trial court stated that:

With regard to Father's income, much was made by both sides with regard to what Father's potential income was, and while Counsel for the [F]ather made the argument that . . . [if] genders were reversed, . . . I would be dealing with this differently.

The problem is that based on Father's education, his degree from Penn, his MBA from Vanderbilt, I can't put him in at minimum wage. I just can't. I've put more than that for people working part time at McDonald's. But that said, I do have an understanding of the present . . . workplace market is, and the notion that he could just easily fall into a $250,000[.00] job isn't realistic either.

At this juncture, I've imputed income in the amount of $3,000[.00].[2] Since I have to . . . say it for the benefit of the

---

[2] The trial court's oral ruling is unclear as to whether the trial court is imputing income to Father in the amount of $3,000.00 per month (i.e. $36,000.00 per year) or $30,000.00 per year. However, the trial court's written order clarifies that the trial court imputed income to Father in the amount of $3,000.00 per

(continued...)

-12-

Court of Appeals, I am finding that he is underemployed. It is willful in that based on his education and experience he could at least get a $30,000[.00] a year job. That's why I am going to impute that figure.

The determination of whether a parent is voluntarily underemployed is a question of fact, which "requires careful consideration of all the attendant circumstances." ***Richardson v. Spanos***, 189 S.W.3d 720, 726 (Tenn. Ct. App. 2005) (citing ***Eldridge v. Eldridge***, 137 S.W.3d 1, 21 (Tenn. Ct. App. 2002); ***Willis v. Willis***, 62 S.W.3d 735, 738–39 (Tenn. Ct. App. 2001)). Such a determination "may be based on any intentional choice or act that adversely affects a parent's income." Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(ii)(I). There is no question in this case that Father is underemployed. His most recent full time employment had him earning approximately $95,000.00 per year. He has an Ivy League education as well as an MBA from Vanderbilt University. Mother's expert opined that Father was capable of earning between $75,000.00 and $125,000.00 per year in the Memphis market. Instead, Father's income at the time of trial was approximately $1,700.00 per month, which he earned through sporadic consulting jobs.

A finding that Father is underemployed, however, does not, *ipso facto,* lead to the conclusion that Father is willfully and voluntarily underemployed for purposes of the Child Support Guidelines. Instead, the focus is whether the underemployment is the product of an intentional choice on the part of the obligor parent. *See* Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(ii)(I).  As explained by this Court in ***Richardson v. Spanos***, 189 S.W.3d 720, 726 (Tenn. Ct. App. 2005):

> When called upon to determine whether a parent is willfully and voluntarily unemployed or underemployed, the courts will consider the factors in Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(d)(2), as well as the reasons for the party's change in employment. ***Demers v. Demers***, 149 S.W.3d 61, 69 (Tenn. Ct. App. 2003); ***Eldridge v. Eldridge***, 137 S.W.3d 1, 21 (Tenn. Ct. App. 2002). If a parent's reasons for working in a lower paying job are reasonable and in good faith, the court will not find him or her to be willfully and voluntarily underemployed. ***Willis v. Willis***, 62 S.W.3d at 738. The courts

---

[2](...continued)
month. It is well settled that a court speaks through its orders. ***Palmer v. Palmer***, 562 S.W.2d 833, 837 (Tenn. Ct. App. 1977). Accordingly, for purposes of this appeal, we will consider the trial court's written finding imputing income to Father in the amount of $3,000.00 per month.

are particularly interested in whether a parent's change in employment [or amount of income] is voluntary or involuntary, ***Eldridge v. Eldridge***, 137 S.W.3d at 21, and are more inclined to find willful and voluntary underemployment when a decision to accept a lower paying job is voluntary. ***Demers v. Demers***, 149 S.W.3d at 69.

***Richardson***, 189 S.W.3d at 726. Accordingly, the touchstones for this inquiry are the reasonableness of the employment decision, and whether the choice to take a lower paying job was voluntary. ***Id.*** This Court further explained:

> Our courts will consider the reasonableness of the obligor parent's occupational choices in light of surrounding circumstances. *See* ***Narus v. Narus***, No. 03A01-9804-CV-00126, 1998 WL 959839 at *2 (Tenn. App. Ct. Dec. 31, 1998) (no Tenn. R. App. P. 11 application filed) (obligor not willfully and voluntarily unemployed or underemployed where obligor chose "to retire at a reasonable age, for legitimate reasons, and otherwise under reasonable circumstances ."). The trial court must consider whether the choice to take a lower paying job is made in good faith and whether some or all of the unrealized earning capacity should be included as imputed income.
>
> * * *
>
> Generally, where a reduced actual income is involved, the fact patterns differ on whether the leaving of previous employment or other income producing activity was voluntary, . . .

***Ralston v. Ralston***, No. 01A01-9804-CV-00222, 1999 WL 562719, at *3 (Tenn. Ct. App. Aug. 3, 1999). It is undisputed in this case that Father lost his most recent full-time employment due to lay-offs that were not within his control. Accordingly, the issue in this case is not whether Father's choice to take a lesser paying job causes him to be underemployed, but whether Father has engaged in a pattern of willful behavior since the lay-off that has resulted in substantially less income for Father and, therefore, less support for the children.

Where a trial court finds that an obligor was willfully and voluntarily unemployed or underemployed, we review that decision with a presumption of correctness unless the preponderance of the evidence is otherwise. ***Ralston***, 1999 WL 562719 at *7. As explained

by this Court:

> The determination of whether an obligor is willfully and voluntarily unemployed or underemployed is dependent upon the factual background of the case. . . . Willful and voluntary unemployment or underemployment does not occur solely in cases where the obligor becomes unemployed or underemployed with the intent to avoid child support obligations. *See **Garfinkel v. Garfinkel***, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996) (citing ***Ford v.. Ford***, No. 02A01-9507-CH-00153, 1996 WL 560258, at *1 (Tenn. Ct. App. Oct. 3, 1996)). Cases differ as to whether an obligor is willfully and voluntarily unemployed or underemployed. *See **Brooks v. Brooks***, 992 S.W.2d 403, 407 (Tenn. 1999) (finding tha[t] an obligor who sold his successful business and began a cattle breeding operation was willfully and voluntarily underemployed); ***Marcus v. Marcus***, No. 02A01-9611-CV-00286, 1998 WL 29645, at *1 (Tenn. Ct. App. Jan. 28, 1998) (finding that an obligor who was terminated from his job and started an internet business was not willfully and voluntarily underemployed); ***Garfinkel***, 945 S.W.2d at 748 (finding that an obligor who quit his job in physics to live off income from rental properties was willfully and voluntarily underemployed).

***Pennington v. Pennington***, No. W2000-00568-COA-R3-CV, 2001 WL 277993, at *3 (Tenn. Ct. App. March 14, 2001).

It is undisputed that Father's action in leaving his employment at Kemmons Wilson was not voluntary. Indeed, the evidence shows that Father, along with several other employees, were dismissed from their employment with Kemmons Wilson for budgetary reasons. Mother argues, however, that Father is willfully and voluntarily underemployed because in the time since his employment was terminated with Kemmons Wilson, he has made the voluntary choice to pursue partnership, or start-up, enterprises, rather than seeking traditional employment. According to Mother, Father's voluntary decision to seek this type of employment has caused Father's earnings to decrease dramatically. Indeed, Father's testimony shows that Father has participated in approximately ten ventures involving new companies that have all failed to result in any full-time employment. However, Father's testimony also shows that Father used these ventures as networking and marketing tools and that, in addition to these ventures, Father sought employment through traditional means (i.e., sending out resumes, contacting family and friends). Furthermore, Mother's own financial

-15-

advisors, as well as Mother's father, testified that Father had contacted them about employment in the financial sector. To rebut this evidence, Mother took issue with Father's inability to state with particularity who he sent resumes to, as well as his failure to take a job in Connecticut in 2011. However, the evidence also showed that the parties considered the job prospect in Connecticut, but mutually decided to remain in Memphis. In addition, we note that Father's failure to provide documentation regarding his job search is not fatal to his claim that his underemployment is involuntary because it is Mother's burden to prove that Father is willfully and voluntarily underemployed, not Father's burden to prove the opposite. *See Massey*, 315 S.W.3d at 796 (holding that the parent seeking to impute income to the other parent bears the burden of proving that the parent is willfully and voluntarily underemployed); *Richardson*, 189 S.W.3d at 726 (noting the primary residential parent has the burden to prove that the alternative residential parent is willfully and voluntarily underemployed).

From the totality of the evidence in the record, we cannot conclude that Mother has met her burden to show that Father is willfully and voluntarily underemployed. Father's education and experience are in the real estate financial sector, a sector particularly affected by the downturn in the economy. From Father's testimony, he used traditional means to seek employment in this field. In addition to traditional means, Father asked Mother's financial advisors and her family for assistance in meeting potential employers. Father's networking succeeded in finding Father sporadic consulting work, but failed to result in full-time employment at a level consistent with his previous employment. In addition, Father's decision to decline the job in Connecticut was a decision reached mutually by the parties, in consideration of the fact that the family had established a home in Memphis and Mother, who had been the primary earner throughout the marriage, would have been forced to leave her employment. The trial court made no adverse credibility findings against Father's testimony concerning his sincere, yet fruitless, efforts to find a job. Indeed, even the trial court apparently had difficulty imputing income to Father at a rate consistent with either the vocational expert's testimony, or Father's most recent prior full-time employment. Instead, the trial court only imputed income to Father of $36,000.00 based on Father's academic credentials. While Mother testified that she knew of several open jobs in banking that she felt Father was qualified for, nothing in Mother's testimony indicates either that she informed Father of these openings or that he voluntarily chose not to pursue these opportunities. In addition, Mother did not testify as to the salary Father could earn at any of these positions. From the totality of the evidence, we must conclude that the evidence preponderates against the trial court's finding that Father was willfully and voluntarily underemployed. As such, the trial court erred in imputing income to Father beyond his actual income and the trial court's calculation of child support is, therefore, reversed. Because we have vacated the trial court's calculation of Mother's income for appropriate findings of fact and conclusions of law and have reversed the trial court's imputation of income to Father, on remand, the trial

court should make a fresh determination of the parties' respective child support obligations.

### 3. Private School Tuition

Father next argues that the trial court erred in requiring him to pay a portion of the children's private school tuition as a deviation from the presumed child support amount. We agree. The trial court ordered Father to pay 15% of the children's private school tuition based on the trial court's finding that Father was willfully and voluntarily underemployed and the imputation of income to Father in the amount of $36,000.00 per year. The trial court, however, failed to make any written findings to support the deviation.

As explained by this Court in *Richardson v. Spanos*:

> Under current law, the amount of support derived from a proper application of the formula in the Child Support Guidelines becomes the presumptive amount of child support owed. This amount of support is rebuttable. Tenn. Code Ann. § 36–5–101(e)(1)(A); Tenn. Comp. R. & Regs. 1240-2-4-.01(1)(d)(1) (Mar. 2005); *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005). Accordingly, trial courts may, in their discretion, deviate from the amount of support required by the Child Support Guidelines, *State v. Wilson*, 132 S.W.3d 340, 343 (Tenn.2004); *Jones v. Jones*, 930 S.W.2d at 545, but when they do, they must make specific written findings regarding how the application of the Child Support Guidelines would be unjust or inappropriate in the case. Tenn. Code Ann. § 36-5-101(e)(1)(A); Tenn. Comp. R. & Regs. 1240-2-4-.07(1)(b) (Mar. 2005).

*Richardson*, 189 S.W.3d at 725. The Guidelines specifically address educational expenses as a deviation from the standard child support amounts:

> (i) Extraordinary educational expenses may be added to the presumptive child support as a deviation. Extraordinary education expenses include, but are not limited to, tuition, room and board, lab fees, books, fees, and other reasonable and necessary expenses associated with special needs education or private elementary and/or secondary schooling that are appropriate to the parents' financial abilities and to the lifestyle of the child if the parents and child were living together.

(ii) In determining the amount of deviation for extraordinary educational expenses, scholarships, grants, stipends, and other cost-reducing programs received by or on behalf of the child shall be considered.

(iii) If a deviation is allowed for extraordinary educational expenses, a monthly average of these expenses shall be based on evidence of prior or anticipated expenses and entered on the Worksheet in the deviation section.

Tenn. Comp. R. & Regs. 1240-2-4-.07(2)(d)(1). Private school tuition constitutes an "extraordinary educational expense" for which the trial court may make an upward deviation to the presumptive child support amount. **Richardson**, 189 S.W.3d at 727 (citing **Barnett v. Barnett**, 27 S.W.3d 904, 907 (Tenn. 2000)). Indeed, the Child Support Guidelines confirm that additional support for private elementary or secondary education should be calculated separately and should be added to the basic support award as an upward deviation from the presumptive amount. Tenn. Comp. R. & Regs. 1240-2-4-.07(2)(d)(1)(i). The Child Support Guidelines also provide that these expenses should be considered on a case-by-case basis and that the courts should also consider whether the private elementary or secondary schooling is "appropriate to the parents' financial abilities and to the lifestyle of the child if the parents and the child were living together." Tenn. Comp. R. & Regs. 1240-2-4-.07(2)(d)(1)(ii).

When making a deviation from the presumptive amount of support, the court must make written findings in its order detailing "the basis for the deviation and the amount the child support order would have been without the deviation." Tenn. Code Ann. § 36-5-101(e)(1)(A); Tenn. Comp. R. & Regs. 1240-2-4-.07(1)(b). The Guidelines further explain the procedure for deviation and require that:

(c) When ordering a deviation from the presumptive amount of child support established by the Guidelines, the tribunal's order shall contain written findings of fact stating:

1. The reasons for the change or deviation from the presumptive amount of child support that would have been paid pursuant to the Guidelines; and
2. The amount of child support that would have been required under the Guidelines if the presumptive amount had not been rebutted; and
3. How, in its determination,
(i) Application of the Guidelines would be unjust or

-18-

inappropriate in the particular case before the tribunal; and
(ii) The best interests of the child for whom support is being
determined will be served by deviation from the presumptive
guideline amount.

Tenn. Comp. R. & Regs. 1240-2-4-.07(1)(c).

The trial court in this case made no written findings that state: (1) the reason for the deviation from the presumptive amount of child support; (2) why application of the guidelines would be unjust or inappropriate; or (3) in what way the best interests of the parties' children will be served by the deviation. As this court stated in *State ex rel. Wrzesniewski v. Miller*, 77 S.W.3d 195 (Tenn. Ct. App. 2001):

> [The] Child Support Guidelines have the force of law. *Jahn v. Jahn*, 932 S.W.2d 939, 943 (Tenn. Ct. App. 1996). Any deviation from the guidelines must be explicitly stated on the record. Tenn. Code Ann. § 36-5-101(e)(1). If the guidelines are not followed, the court must make written specific findings that their application would be unjust or inappropriate, stating the amount that should be awarded under the guidelines, along with justification for the deviation. Tenn. Comp. R. & Regs. Ch. 1240-2-4-.02(7).

*Miller*, 77 S.W.3d at 197. Because the trial court failed to make the requisite findings, we vacate the award of private school tuition and remand to the trial court to make the appropriate findings consistent with the Child Support Guidelines. As this Court has also vacated the trial court's calculation of Mother's income and has reversed the calculation of Father's income for child support purposes, the trial court, using Father's actual income and Mother's income as found by the trial court after reconsideration, should make a fresh determination as to whether a deviation from the presumptive child support amount is warranted in this case. In addition, we note that "the trial court should endeavor to ascertain and give effect to the parties' actual circumstances, which will necessarily change over the course of time, e.g., people remarry, have more children, insurance premiums rise and fall, and child care needs change." *In re Jaiden C.W.*, No. M2012-01188-COA-R3-JV, 2013 WL 1501876, at *8 (Tenn. Ct. App. April 11, 2013). Accordingly, on remand, the trial court is not precluded from taking and considering any relevant evidence on the child support issues.

### B. Parenting Plan

Father next argues that the trial court erred in adopting Mother's Proposed Permanent

Parenting Plan, in which Mother was given final decision making authority for the children with regard to educational decisions. According to Father, the trial court erred in allowing Mother to be the final decision maker because this decision, in essence, allows Mother to be the only decision maker, as he opposes the children's continued enrollment in private school.

Trial courts have great discretion in the details of visitation arrangements. ***Hogue v. Hogue***, 147 S.W.3d 245, 251 (Tenn. Ct. App. 2004). Thus, the trial court's decision regarding parenting issues, including which parent is vested with decision-making authority regarding the child, will be reviewed under the abuse of discretion standard. ***Fulford v. Fulford***, No. M2006-02625-COA-R3-CV, 2008 WL 1813108, at \*6 (Tenn. Ct. App. April 22, 2008) (applying the abuse of discretion standard in a case involving the parents authority to make medical decisions); *see also* ***Greer v. Greer***, No. W2009-01587-COA-R3-C, 2010 WL 3852321 (Tenn. Ct. App. Sept. 30, 2010) (applying the abuse of discretion standard in a case involving which parent should be vested with decision making authority regarding the minor child). "[A] trial court's decision regarding custody or visitation should be set aside only when it 'falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" ***Curtis v. Hill***, 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006) (quoting ***Eldridge v. Eldridge***, 42 S.W.3d 82, 88 (Tenn. 2001)). Thus, it is not within the province of appellate courts to tweak a parenting plan in hopes of achieving a better result than the trial court. *See* ***Eldridge***, 42 S.W.3d at 88. As our Supreme Court has explained:

> When no error in the trial court's ruling is evident from the record, the trial court's ruling must stand. This maxim has special significance in cases reviewed under the abuse of discretion standard. The abuse of discretion standard recognizes that the trial court is in a better position than the appellate court to make certain judgments. The abuse of discretion standard does not require a trial court to render an ideal order, even in matters involving [parental responsibilities], to withstand reversal. Reversal should not result simply because the appellate court found a "better" resolution. *See* ***State v. Franklin***, 714 S.W.2d 252, 258 (Tenn. 1986) ("appellate court should not redetermine in retrospect and on a cold record how the case could have been better tried"); *cf.* ***State v. Pappas***, 754 S.W.2d 620, 625 (Tenn. Crim. App. 1987) (affirming trial court's ruling under abuse of discretion standard while noting that action contrary to action taken by the trial court was the better practice); ***Bradford v. Bradford***, 51 Tenn. App. 101, 364 S.W.2d 509, 512–13 (1962) (same). An abuse of discretion can

be found only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record. See, e.g., ***State ex. rel Vaughn v. Kaatrude,*** 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000).

***Eldridge***, 42 S.W.3d at 88. The trial court's discretion, however, is not unbounded. ***Hogue***, 147 S.W.3d at 251 (citation omitted). The court must base its decision upon proof and apply the appropriate legal principles. ***Id.*** (citation omitted).

A permanent parenting plan must "[a]llocate decision-making authority to one (1) or both parties regarding the child's education, health care, extracurricular activities, and religious upbringing." Tenn. Code Ann. § 36-6-404(a)(5). Specifically, the trial court ruled that the parties would share decision making authority, but ruled that Mother would have final decision making authority in the event of an impasse. Tennessee Code Annotated Section 36-6-407 specifies the criteria for the trial court to consider when allocating parenting responsibilities:

> (1) The existence of a limitation under § 36-6-406;[3]
> (2) The history of participation of each parent in decision making in each of the following areas: physical care, emotional stability, intellectual and moral development, health, education, extracurricular activities, and religion; and whether each parent attended a court ordered parent education seminar;
> (3) Whether the parents have demonstrated the ability and desire to cooperate with one another in decision making regarding the child in each of the following areas: physical care, emotional stability, intellectual and moral development, health, education, extracurricular activities, and religion; and
> (4) The parents' geographic proximity to one another, to the extent that it affects their ability to make timely mutual decisions.

Tenn. Code Ann. § 36-6-407(c)

---

[3]Tennessee Code Annotated Section 36-6-406 allows the court to eliminate the requirement of mediation or limit parenting time if there is "reliable evidence" of physical, emotional, or sexual abuse, or if one parent lives with an individual who has engages in such abuse. There are no allegations of abuse of any kind in this case. Accordingly, this statute does not apply to limit which parent may make decisions for the children.

Father first points out that the parties were operating under a temporary parenting plan, in which major decisions regarding the children would be jointly resolved by the parties. If, however, the parties were unable to resolve a dispute, the parties agreed to allow the issues to be resolved by a neutral decision-maker.[4] Father contends that this arrangement worked adequately during the pendency of the divorce and that, as such, there was no basis to give Mother more authority. However, temporary orders are just that, temporary, and may be altered by the trial court at any time. Indeed, the temporary order in this case specifically states that the order is temporary and that it "shall be without prejudice to either party. This Order shall have no precedential [effect] with respect to any of the issues raised herein at the final hearing." Accordingly, the fact that Mother agreed to refer all unresolved disputes to a neutral decision-maker in the temporary parenting plan does not prevent her from changing her stance on this issue at trial. Nor does the temporary order prevent the trial court from adopting a different arrangement.

In addition, Father argues that the evidence shows that Mother often took unilateral action with regard to the children's education and extracurricular activities. According to Father, this evidence shows that Mother has not "demonstrated the ability and desire to cooperate with [Father] in decision making." Tenn. Code Ann. § 36-6-407(c)(3). Indeed, Father testified that Mother made most of these decisions with little to no input from Father. However, the record shows that Father acquiesced in these decisions throughout the marriage and even after its demise. Only when Father was faced with the prospect of paying a portion of these expenses did he object. For example, Father's own Complaint for Divorce asks that the children continue to attend both the Jewish Community School and St. Mary's Episcopal School in Memphis, and that the appropriate party be ordered to pay the tuition. Indeed, Father's own Proposed Permanent Parenting Plan, filed on April 17, 2012, gave Mother unilateral decision-making authority over all education and non-emergency health care decisions. At some point prior to trial, however, Father changed his mind about sending the children to private school and insisted that the children attend public school. Accordingly, at trial, Father presented a Proposed Permanent Parenting Plan in which the parties had joint decision making authority over all decisions, including educational and health care decisions and all disputes were referred to mediation.

At trial, Mother, the nanny, and the babysitter testified that although Father previously took an active role in the children's lives, once Father lost his job, his behavior changed, he was distant, and he was no longer as involved in the day-to-day lives of the children. The evidence showed that towards the end of the marriage, Mother was tasked with all

---

[4] Specifically, the order provided that issues regarding whether the children should have tubes placed in their ears would be resolved by the children's pediatrician. All other disputes would be referred to mediation.

responsibility for educational decisions, for taking the children to the doctor, and for scheduling the children's extracurricular activities. Finally, although Father objected to the children celebrating Christmas in addition to the Jewish holidays, Father allowed this practice to occur throughout the marriage and there was no dispute that the children would be raised in the Jewish faith. Further, Father asked, in his own Proposed Permanent Parenting Plan, that the children would spend every single Jewish holiday with Mother. In these circumstances, we cannot conclude that the trial court abused its discretion in granting Mother final decision-making authority for the children on these issues. We caution, however, that Mother may not unilaterally make decisions regarding the children without input from Father, but must make a good faith effort to resolve all disputes first. The trial court's ruling with regard to the Permanent Parenting Plan is, therefore, affirmed.

### C. Property Division

Mother next argues that the trial court erred in ordering her to pay the balance on the parties' home equity line of credit ("HELOC"), which debt was incurred during the marriage. Both parties agree that the HELOC was a marital debt subject to equitable division. Father, argues, however, that the trial court correctly required Mother to pay the full balance on the HELOC.

The standard of review for a trial court's decision regarding the division of marital property was explained by this Court in *Owens v. Owens*, 241 S.W.3d 478 (Tenn. Ct. App. 2007):

> Once the parties' marital property has been classified and valued, the trial court's goal is to divide the marital property in an essentially equitable manner. Tenn. Code Ann. § 36-4-121(a)(1); *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001). A division of marital property is not rendered inequitable simply because it is not precisely equal, *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002), *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996), or because each party did not receive a share of every piece of marital property, *Morton v. Morton*, 182 S.W.3d 821, 833–34 (Tenn. Ct. App. 2005); *Manis v. Manis*, 49 S.W.3d at 306. The fairness of the trial court's approach is inevitably reflected in its results. *Altman v. Altman*, 181 S.W.3d 676, 683 (Tenn. Ct. App. 2005); *Bolin v. Bolin*, 99 S.W.3d 102, 107 (Tenn. Ct. App. 2002).
> The approach to dividing a marital estate should not be mechanical, but rather should entail carefully weighing the

relevant factors in Tenn. Code Ann. § 36-4-121(c) in light of the evidence that the parties have presented. *Flannary v. Flannary*, 121 S.W.3d at 650–51; *Tate v. Tate*, 138 S.W.3d 872, 875 (Tenn. Ct. App. 2003); *Kinard v. Kinard*, 986 S.W.2d at 230. Trial courts have broad discretion in fashioning an equitable division of marital property, *Jolly v. Jolly*, 130 S.W.3d 783, 785 (Tenn. 2004); *Fisher v. Fisher*, 648 S.W.2d 244, 246 (Tenn. 1983), and appellate courts must accord great weight to a trial court's division of marital property. *Wilson v. Moore*, 929 S.W.2d 367, 372 (Tenn. Ct. App. 1996); *Batson v. Batson*, 769 S.W.2d 849, 859. Accordingly, it is not our role to tweak the manner in which a trial court has divided the marital property. *Morton v. Morton*, 182 S.W.3d at 834. Rather, our role is to determine whether the trial court applied the correct legal standards, whether the manner in which the trial court weighed the factors in Tenn. Code Ann. § 36-4-121(c) is consistent with logic and reason, and whether the trial court's division of the marital property is equitable. *Jolly v. Jolly*, 130 S.W.3d at 785–86; *Gratton v. Gratton*, No. M2004-01964-COA-R3-CV, 2006 WL 794883, at *7 (Tenn. Ct. App. Mar.28, 2006) (No Tenn. R. App. P. 11 application filed); *Kinard v. Kinard*, 986 S.W.2d at 231.

The division of the marital estate includes both the division of the marital property and the allocation of the marital debt. Trial courts have not completely divided a marital estate until they have allocated both the marital property and the marital debt. *Robertson v. Robertson*, 76 S.W.3d at 341; *Hopkins v. Hopkins*, No. M2002-02233-COA-R3-CV, 2003 WL 21462971, at *6 (Tenn. Ct. App. June 25, 2003), *rev'd in part on other grounds*, 152 S.W.3d 447 (Tenn. 2004); *Anderton v. Anderton*, 988 S.W.2d at 679. Thus, an examination of the manner in which a trial court divided the marital property must take into consideration how the trial court allocated the marital debt.

*Owens*, 241 S.W.3d at 489–90.

At the time of trial, the balance on the HELOC was approximately $27,341.00. Although both parties asked the trial court to divide the balance of the HELOC equally, the trial court ordered Mother to pay the balance, stating:

-24-

With regard to the second mortgage, also referenced as an equity line of credit, I'm finding that there—when I was told there was a home equity line of credit, I was kind of surprised, based on the number of assets that were involved in this case. For that reason I found that there were clearly funds available.

The parties had tapped the Vangaurd account of the IBM stock previously prior to the separation—prior to the divorce being filed. And I have to look at it[,] this was a financial decision made by the parties and, in effect[, they] were preserving assets of the trust, and obviously there was some financial decision—or some business decision to taking on additional debt rather than depleting the trust assets.

As such, I'm going to hold [Mother] responsible for the [HELOC].

As such, the trial court found that debt was incurred by the parties jointly, to fund marital deficiencies, and that a result of the parties taking out the HELOC was that Mother's separate assets were not depleted.

In determining how to divide marital debts, the Tennessee Supreme Court has established the following guidelines:

Tennessee courts should use the four factors listed in *Mondelli* as guidelines in the equitable distribution of marital debt: (1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt. *Mondelli* [*v. Howard*], 780 S.W.2d [769,] 773 [(Tenn. Ct. App. 1989)]. A careful application of these factors will insure the fairest possible allocation of debt. It will also protect the spouse who did not incur the debt from bearing responsibility for debts that are the result of personal excesses of the other spouse.

*Alford v. Alford*, 120 S.W.3d 810 (Tenn. 2003).

As to the first two issues—the debt's purpose and who incurred the debt—Mother points to Father's Complaint for Divorce in which he states that he withdrew $40,000.00 from the HELOC to fund his separate living expenses. From our review of the trial court transcript, however, no testimony was elicited from Father in which he admitted that he withdrew $40,000.00 from the HELOC for his own separate maintenance. Instead, Father

states that shortly before the divorce, Mother froze the HELOC and other accounts so that he could not withdraw funds. Later, Father testified that although he originally planned to use the HELOC to fund the remodel on his new home, he was unable to do so, and resorted to credit cards and loans from his father. In addition, in describing the purpose of the HELOC, Mother stated that "it was marital debt that we were incurring and I thought that we would just put a HELOC on our marital property." Mother also admitted that she froze the HELOC account so that neither party had access, but she was unable to recall at what date she did so. Under these circumstances, we cannot conclude that the evidence preponderates against the trial court's finding that this debt was incurred jointly by the parties in order to meet deficiencies during the marriage.

The trial court clearly found that the next issue—the party that benefitted from incurring the debt—weighed in favor of assigning the debt to Mother. We agree. Although both parties benefitted from the debt because it was used to pay monthly deficiencies throughout the marriage, Mother reaped the most benefit because her separate assets were preserved. There is no question that Mother's separate assets in this case outweigh Father's. In addition, it is undisputed that the parties liquidated a portion of Mother's stock during the marriage. However, the evidence also shows that Father also liquidated a large portion of his separate property during the marriage, while the bulk of Mother's separate property was protected. In this situation, we cannot conclude that the evidence preponderates against the trial court's finding.

Finally, we conclude that Mother is the party best able to repay the debt. At the time of trial, Mother's income was far greater than Father's. In fact, Mother's income was greater than Father's throughout the marriage. Mother also leaves the marriage with her considerable separate assets intact. Father, in contrast, liquidated a portion of his separate property during the marriage. His income is also sporadic. Based on the foregoing, we conclude that the trial court did not err in ordering Mother to pay the entire balance of the HELOC. The trial court's ruling with regard to the division of marital property is, therefore, affirmed.

### D. Alimony

Both Mother and Father raise issues regarding the trial court's rulings on alimony. Mother contends that the trial erred in awarding Father alimony *in solido* in the amount that Father unilaterally withdrew from the children's trust accounts. Father argues that the trial court erred in failing to award him periodic alimony. Finally, both parties argue that the trial court erred in failing to award their respective attorney fees.

The Tennessee Supreme Court has consistently recognized that trial courts in Tennessee have broad discretion to determine whether spousal support is needed and, if so,

to determine the nature, amount, and duration of the award. *See*, *e.g.*, ***Gonsewski v. Gonsewski***, 350 S.W.3d 99, 105 (Tenn. 2011); ***Bratton v. Bratton***, 136 S.W.3d 595, 605 (Tenn. 2004); ***Burlew v. Burlew***, 40 S.W.3d 465, 470 (Tenn. 2001); ***Crabtree v. Crabtree***, 16 S.W.3d 356, 360 (Tenn. 2000). Because a trial court's "decision regarding spousal support is factually driven and involves the careful balancing of many factors," ***Gonsewski***, 350 S.W.3d at 105 (footnote omitted), the role of an appellate court is not to second guess the trial court or to substitute its judgment for that of the trial court, but to determine whether the trial court abused its discretion in awarding, or refusing to award, spousal support. ***Id***.; ***White v. Vanderbilt Univ.***, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999) ("If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative."). "An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." ***Id.*** (citing ***Wright ex rel. Wright v. Wright***, 337 S.W.3d 166, 176 (Tenn. 2011); ***Henderson v. SAIA, Inc***., 318 S.W.3d 328, 335 (Tenn. 2010)). In determining whether the trial court abused its discretion, an appellate court "should presume that the [trial court's] decision is correct and should review the evidence in the light most favorable to the decision." ***Gonsewski***, 350 S.W.3d at 105–06; *see also* Tenn. R. App. P. 13(d) ("[R]eview of findings of fact by the trial court in civil actions shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding [s], unless the preponderance of the evidence is otherwise.").

Tennessee recognizes four distinct types of spousal support: (1) alimony *in futuro*, (2) alimony *in solido*, (3) rehabilitative alimony, and (4) transitional alimony. Tenn. Code Ann. § 36-5-121(d)(1) (2010 & Supp. 2012). Alimony *in futuro* is a form of long-term support. An award of alimony *in futuro* is appropriate when the economically disadvantaged spouse cannot achieve self-sufficiency and economic rehabilitation is not feasible. ***Gonsewski***, 350 S.W.3d at 107. Alimony *in solido*, another form of long-term support, is typically awarded to adjust the distribution of the marital estate and, as such, is generally not modifiable and does not terminate upon death or remarriage. ***Id.*** at 108. By contrast, rehabilitative alimony is short-term support that enables a disadvantaged spouse to obtain education or training necessary to become self-reliant following a divorce. ***Id***. Where economic rehabilitation is unnecessary, transitional alimony may be awarded. Transitional alimony assists the disadvantaged spouse with the "transition to the status of a single person." ***Id***. at 109 (internal quotation marks omitted). In this case, we are concerned only with transitional alimony and alimony *in solido*. We begin with Father's request for transitional alimony.

### 1. Transitional Alimony

"Transitional alimony is designed to aid a spouse who already possesses the capacity

for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income." *Gonsewski*, 350 S.W.3d at 107. Consequently, "transitional alimony has been described as a form of short-term 'bridge-the-gap' support designed to 'smooth the transition of a spouse from married to single life.'" *Mayfield v. Mayfield*, 395 S.W.3d 108 (Tenn. 2012) (citing *Engesser v. Engesser*, 42 So.3d 249, 251 (Fla. Dist. Ct. App. 2010)). Transitional alimony is payable for a definite period of time and may be modified only if: (1) the parties agree that it may be modified; (2) the court provides for modification in the divorce decree, decree of legal separation, or order of protection; or (3) the recipient spouse resides with a third person following the divorce. Tenn. Code Ann. § 36-5-121(g)(2). Tennessee statutes concerning spousal support reflect a legislative preference favoring rehabilitative or transitional alimony rather than alimony *in futuro* or *in solido*. *See* Tenn. Code Ann. § 36-5-121(d)(2)–(3); *Gonsewski*, 350 S.W.3d at 109. Decisions regarding the type, length, and amount of alimony turn upon the unique facts of each case and careful consideration of many factors, including, but not limited to, the statutory factors contained in Tennessee Code Annotated Section 36-5-121(i). The pertinent factors include:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;
(3) The duration of the marriage;
(4) The age and mental condition of each party;
(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
(7) The separate assets of each party, both real and personal, tangible and intangible;
(8) The provisions made with regard to the marital property as defined in § 36-4-121;
(9) The standard of living of the parties established during the marriage;
(10) The extent to which each party has made such tangible and

intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i). The two most important factors, however, are the disadvantaged spouse's need and the obligor spouse's ability to pay. *Gonsewski*, 350 S.W.3d at 109–10.

At trial, Father requested transitional alimony of $6,000.00 per month for forty-eight months. In denying Father's request, the trial court stated:

> With regard to Husband's request for alimony, in reviewing the standards . . . set forth in the statute, based on his education and experience, I'm going to find that this is not a case for . . . alimony in futuro. It's not, based on his education, a case for rehabilitative alimony.
> I'm going to make a finding that this is not the case for transitional alimony. The parties have been separated for over a year and both of them, on some level, have gone on with their lives and supported themselves. As such, I'm not going to find that this is a case appropriate for transitional alimony.

Father argues, however, that given the significant income and separate property disparities between him and Mother, he is an appropriate candidate for transitional alimony. Although there is a disparity between the parties' incomes, we cannot agree that the trial court abused its discretion in declining to award Father his requested alimony solely based on that disparity.

First, we note that both parties are of working age and have no mental or physical conditions which would prevent them from earning income in the future.[5] In addition, the

___

[5] Father testified that he suffered from depression due to the loss of his employment. Mother testified that she suffered from anxiety as a young adult. However, neither party testified that these issues impacted

(continued...)

parties have exactly the same "relative education and training," having both obtained bachelors degrees from Ivy League institutions and masters degrees from Vanderbilt University. Neither party has expressed a desire or a need to further his or her education in order to reach full earning potential. With regard to the "relative earning capacity, obligations, needs, and financial resources of each party," we agree that this case involves significant disparities. At the time of trial, Mother was earning gross income of $16,954.00 per month. In contrast, Father was earning approximately $1,487.00 per month. Based on Father's actual income of $1,487.00 per month and his Rule 14C Affidavit filed at trial, Father represents that he incurs a $4,746.00 deficit per month. Despite a less than $5,000.00 deficit, Father requested $6,000.00 per month in alimony. However, we must note that Father's relative earning capacity is much higher than his actual income. This Court has previously considered a party's "capacity to earn" rather than his actual income for purposes of alimony, even when there was no finding that the party was willfully and voluntarily underemployed. *See Yattoni-Prestwood v. Prestwood*, 397 S.W.3d 583, 594 (Tenn. Ct. App. 2012) (in awarding alimony to wife, the Court noted that husband was on a tight budget, but that he had the capacity to earn more); *Storey v. Storey*, 835 S.W.2d 593 (Tenn. Ct. App. 1992) (considering that husband's earning capacity was greater than his actual income). As such, "[w]hat is necessary to be found before a court can impute income to [a spouse] when determining [the] need for alimony purposes is not necessarily the same as what must be found before a court can impute income . . . for purposes of calculating child support under the Guidelines." *Pearson v. Pearson*, No. E2007-02154-COA-R3-CV, 2008 WL 4735305, at *15 (Tenn. Ct. App. Oct. 27, 2008) (imputing income to wife for purposes of alimony, but affirming the trial court's finding that wife was not willfully and voluntarily underemployed for purposes of child support). Considering Father's earning capacity, Father's most recent full-time employment earned him approximately $95,000.00. In addition, Mother's expert testified that Father's education and experience should allow him to earn at least $75,000.00 in the current Memphis job market. Even Father admitted that his earning capacity was greater than his actual income. Although Father's earning capacity remains less than Mother's, using his earning potential of no less than $75,000.00 per year, Father has a monthly surplus of $17.00. Accordingly, regardless of whether Mother has a surplus, Father has failed to demonstrate that he has a need for support. Without demonstrating that need, we are unable to conclude that the trial court abused its discretion in declining to award Father transitional alimony.

Father argues, however, that other factors support an award of transitional alimony, including the disparity between the parties' separate assets. At the time of trial, Mother held separate property valued by the trial court at $2,356,909.00. Father's separate property was

---

[5](...continued)
their ability to work and earn income.

only valued at $68,396.87. However, as previously discussed, Mother has never used her separate assets to fund her lifestyle, either during the marriage or after the separation. In addition, the trial court awarded Father approximately $75,000.00 more marital property than it awarded to Mother. Finally, Father was also awarded approximately $27,000.00 in alimony *in solido* to repay the children's educational trusts, discussed in detail *infra*.

As to the standard of living, it cannot be argued that the parties did not enjoy a high standard of living during the marriage. However, the record shows that the parties did not live within their means, even when they were earning two substantial incomes, and resorted to credit to fund their lifestyle. In this situation, it cannot be expected that the parties would be able to maintain the same standard of living as during the marriage. Indeed, recognizing this issue, the Tennessee Supreme Court has held that not even long-term support is a guarantee that the recipient spouse will be able to maintain the same standard of living enjoyed before the divorce because "two persons living separately incur more expenses than two persons living together." ***Gonsewski***, 350 S.W.3d at 108 (quoting ***Kinard v. Kinard***, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998)). Although the parties' standard of living is a factor courts must consider when making alimony determinations, *see* Tenn. Code Ann. § 36-5-121(i)(9), the economic reality is that the parties' post-divorce assets and incomes often will not permit each spouse to maintain the same standard of living after the divorce that the couple enjoyed during the marriage. ***Gonsewski***, 350 S.W.3d at 113.

This marriage lasted approximately seven years. The trial court did not consider the relative fault of the parties, but did consider the length of the parties' separation. Indeed, at the time of trial, the parties had been living separately for approximately four months and had been separated for approximately seventeen months. The trial court placed great weight on this factor, essentially finding that Father had already made the transition from married life to post-married life. In addition, from January 2012 to the time of trial in April 2012, Father received $1,500.00 per month in alimony *pendente lite* to ease his transition. Father also received a premature distribution of marital property during this time in the amount of $62,500.00. Further, Father admitted that after the parties separated, including when Father was still living in the marital home, Father used none of his income to pay marital or child expenses. Father also paid no child support during the pendency of the divorce. The record also shows that Father purchased a $200,000.00 home. Despite the fact that the home was "livable" at the time of purchase, Father chose to make costly renovations to the property that were still not completed at trial. Based on Father's decision, he was required to pay not only the mortgage on the home, but also rent for an apartment. Accordingly, it appears that by the time of trial, the parties had been living separate lives for over a year and the reason Father had not yet moved into his new home was due to renovations that were not required, but that he chose to do regardless. Thus, nothing in the record suggests the trial court abused its discretion in placing considerable weight on this factor in denying Father's request for

transitional alimony.

Finally, we note that nothing in the record suggests that "it would be undesirable for [Father] to seek employment outside the home." Prior to losing his job, Father always worked outside the home. Indeed, Mother, the nanny, and the babysitter all testified that after Father lost his job, he was less available to help care for the children than before. The weight of the evidence in the record shows that Father made minimal contributions to the marriage and the family in the years immediately preceding the separation. Father's lesser income, then, was not the result of his choice to focus on his family or based upon any effort to boost Mother's career and education.

In sum, Father has a good education and a high earning potential. Father and Mother have been separated for over a year and have maintained separate households throughout this time. Father received alimony *pendente lite* to ease his transition from the marital home, as well as a larger portion of the marital property. In addition, Mother was required to repay funds that Father admitted he unilaterally withdrew from the children's educational accounts during the pendency of the divorce, as discussed in detail, *infra*. Finally, at the time of trial, Father had chosen to delay moving into his new home in order to engage in costly renovations that were not strictly necessary. Although Mother has a much higher salary, more separate property, and will likely enjoy a somewhat higher standard of living than Father, we agree with the trial court that the parties have already made the transition from their married lifestyle to a post-divorce lifestyle, which fact was given great weight by the trial court. In addition, the evidence in the record shows that Father's lower income relative to Mother's was not the product of lack of education or his decision to sacrifice his career for either Mother's, or the family's needs.

The situation presented in this case is similar to that presented in *McKee v. McKee*, No. M2009-01502-COA-R3-CV, 2010 WL 3245246 (Tenn. Ct. App. Aug. 17, 2010), in which husband sought alimony solely based on the fact that wife earned more income, approximately six and one-half times greater than that of husband. In rejecting husband's argument, the trial court stated that:

> [Husband] also requests alimony on the basis that he is economically disadvantaged because plaintiff earns more money. That is not what is meant by economically disadvantaged. The legislature sets forth the policy basis for alimony in T.C.A. § 36-5-121(c)(1) . . . .
>
> In essence, a homemaker who sacrifices career opportunities for the marriage suffers a relative economic

-32-

disadvantage. [Husband] suffered no relative economic disadvantages. Both [husband] and [wife] completed their education and began professional careers at the time of the marriage. [Husband] pursued his career unhindered by any marital obligations. He did not subordinate his career for the benefit of the marriage. Since he suffered no relative economic disadvantages, alimony is inappropriate.

*Id.* at *11. In affirming the trial court, the Court of Appeals explained:

Husband did not suffer "economic detriment" of the kind described in Tenn. Code Ann. § 36-5-121(c)(1) in that he did not subordinate his career in order to focus on "nurturing the personal side of the marriage" or to build "the economic strength of the family unit." Husband's choosing of a career that provides substantial income, but not as substantial as that of Wife, is not a basis for finding an economic disadvantage.

*Id.* Likewise in this case, Father's actual income is substantially lower than Mother's and has been throughout the marriage. However, nothing in the record suggests that Father's employment choices have been subordinated in order to nurture the family. While Father did choose not to accept a higher paying position in Connecticut during the marriage, Father's failure to gain full-time employment since the separation and during the pendency of the divorce has not been due to his efforts to help the family. Indeed, the testimony in the record shows that since Father lost his job, he has been much less likely to expend his efforts to "nurture the personal side of the marriage," or to substantially participate in parenting the parties's children. Based on the foregoing, we conclude that the trial court was within its discretion to deny Father's request for transitional alimony. The trial court's ruling with regard to transitional alimony is, therefore, affirmed. Accordingly, we next consider the parties's arguments regarding alimony *in solido*.

### 2. Alimony *in Solido*

### I. Children's Educational Trusts

Mother first contends that the trial court erred in ordering her to repay the funds from the children's educational trusts that were unilaterally withdrawn from the accounts by Father. The trial court ordered Mother to repay these funds as a form of alimony *in solido* to Father. Specifically, the trial court stated:

With regard to alimony in solido, . . . during the course of the divorce, funds were removed from the children's 529 account[s] in the amount of approximately $27,000.00. . . . [I]n order to ensure that the money is repaid, I'm going to . . . order [Mother] to pay that back as alimony *in solido*. Rather than pay that directly to Mr. Rogin, I'm just going to cut out the middle man in order to make sure that those funds get refunded into [those] account[s].

As previously discussed, alimony *in solido* is a form of long-term alimony that may be awarded in one lump-sum payment. *See* **Gonsewski**, 350 S.W.3d at 107. Mother argues that Father should be required to repay this money because he unilaterally removed the money to fund his own separate expenses during the pendency of the divorce. Mother further points to Father's own testimony at trial that he was requesting that the trial court assign the debt to him, allowing him to repay the debt in installments. The trial court apparently decided to require Mother to repay the funds in order to ensure that the funds were, in fact, repaid. As previously discussed, Mother has a much higher actual income than Father. Although Father's earning capacity is much higher than he is currently earning, his earning capacity does not affect his present ability to repay this money. As found by the trial court, the most important factor is that the money is repaid. Given Mother's substantial separate assets and her higher present income, we cannot conclude that the trial court abused its discretion in finding that Mother had a far greater ability than Father to immediately repay this money. Accordingly, the trial court's ruling with regard to alimony *in solido* is affirmed.

## II. Attorney Fees

Both Mother and Father next contend that the trial court erred in declining to award them their respective attorney fees as alimony *in solido*. As with any alimony award, in deciding whether to award attorney fees as alimony *in solido*, the trial court should consider the relevant factors enumerated in Tennessee Code Annotated Section 36-5-101(d). The award of attorney fees is within the trial court's discretion and will not be overturned absent an abuse of discretion. **Wright ex rel. Wright v. Wright**, 337 S.W.3d 166, 176 (Tenn. 2011). On appeal, Father contends that Mother's action in disclosing six financial experts six weeks prior to trial resulted in delays and additional attorneys fees incurred to respond. Mother, in turn, contends that Father's action in seeking to reclassify much of her separate property as marital for purposes of division, and then altering that strategy with regard to some property immediately prior to trial, resulted in additional attorney fees. We agree on both counts; both parties substantially contributed to the costs of this litigation. The "relative fault of the parties" in causing the attorney fees to be incurred is a factor that may be considered in awarding attorney fees as alimony *in solido*. *See* Tenn. Code Ann. § 36-5-101(d)(11).

-34-

Accordingly, we have determined that the trial court was within its discretion to require each party to pays his or her respective attorney fees. Both parties also seek their attorney fees on appeal. In **Baggett v. Baggett**, 512 S.W.2d 292, 294 (Tenn. Ct. App. 1973), this Court held that an award of attorney's fees was inappropriate where both parties were partially successful on appeal. *See also* **Storey**, 835 S.W.2d at 598 (applying **Baggett** and likewise holding that an award of attorney fees was inappropriate when both parties to a divorce prevailed on appeal). Accordingly, we decline to award attorney fees to either Mother or Father on appeal.

## IV. Conclusion

The judgment of the Circuit Court of Shelby County is reversed in part, vacated in part, affirmed in part, and remanded for all further proceedings as are necessary and are consistent with this opinion. Costs of this appeal are taxed one-half to Appellant Alexander A. Rogin, and his surety, and one-half to Appellee Joelle L. Rogin, for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE